The next case for argument is Consolino v. Dart. Good morning, Your Honors. May it please the Court. My name is Cass Casper. I represent the plaintiffs in this matter. We are here on appeal from review of the District Court's Grant Summary Judgment. There's an expression that revenge is a dish best served cold. And yet, our case law, particularly the Kidwell v. Eisenhower case, which has been cited 1,123 times according to Westlaw, more often than not for the timing rule, has this, is strangely divorced from that expression. And what we are seeing in our District Court decisions, there's two threads of decisions, is a tendency to analyze. We are not here to discuss what we are seeing in our District Courts. We're here to discuss this case. Yes, Judge. Thank you. It is my belief that what the District Court did was that it isolated timing and it considered it in a vacuum without considering that this is truly a timing plus case, timing plus other bona fide circumstantial evidence, and that by isolating timing, what the District Court did is dispatch with it without considering the fact that it must be considered with other circumstantial evidence. This error in the District Court's reasoning below seems to emerge from its reliance on the Kidwell v. Eisenhower case, as well as the Bless v. Cook County case, where the usefulness of timing is reduced to the rule. In order for timing to give rise to an inference of retaliation, it must be no more... I'm just getting lost. Sorry? The District Judge found, and I take it you agree, that the Sheriff's budget actually was cut by 10% and that people had to be let go. I take it that it is agreed that all of the commanders, without exception, were let go. That is agreed. Is that true? Yes. How can one show that that is a pretext of any kind? It is our belief that a jury could find that the decision to select the commanders was itself the retaliatory action. I could imagine an argument along those lines if some vocal commanders were let go and others not. But you agree that every commander was let go. Nearly every commander was let go. There was one in the record who was not let go. But that threat of evidence was not really pursued. But we submit all the commanders were vocal because the recommended decision in order from August 2, 2017, was the culmination of all of their collective protected activity. That was not a recommended decision in order as to one, two, or six commanders. It unionized all of them. So we submit that to consider the commanders separately is not an appropriate way to look at this case. It's to look at them as a whole, as engaging in protected activity as a whole. Prior to the decision of the administrative law judge in the NLRB, were the commanders considered exempt from the political hiring restrictions? There is some evidence in the record that they were exempt. But that term was never clarified what that truly means, if it's exempt in the Rutan or those lines of cases, exempt in the confidential line of cases, it's never clear in the record what that actually means versus them just being on an exempt list. And it's our position here that the union activity was First Amendment protected activity. And defendants really don't elaborate on that point in their brief or in the record below. Well, certainly the sheriff lost control, was going to lose control of these guys, these commanders if that NLRB decision at the trial level stuck, right? I don't know that we can know that. I mean, I don't think there's any indication in the record that they would have been disloyal. I mean, the fundamental thing they were attempting to do at the labor board was to improve their working conditions, improve their shifts, improving their wages and working conditions. And I don't know that it – Well, if they're considered by the NLRB to be worker bees, it sounds like the sheriff would have a pretty hard time justifying that he had some political control over them. I don't think the ILRB decision ever ruled on that. I understand it. I understand that. I'm trying to look at this from the point of view of why the sheriff did what he did with the commanders. Well, we submit that if he did do that, that would actually be an act of retaliation. After all, all they did was attempted to form a union, and they did so reasonably successfully as of August 2nd when the recommended decision order came out. And our theory of the case is that they used the budget excuse as an excuse to retaliate against them. That's the theory of this case. By the way, where does this right to form a union in the public sector come from? The Illinois Labor Relations Act. Right. It's state law, not the Constitution. I'm a little surprised that you haven't cited, nor for that matter has the sheriff, cited three decisions of the Supreme Court that held that the First Amendment has nothing to do with public sector unions and that public sector employers are free to discriminate against people who want public sector unions. Now, those are holdings of the Supreme Court, which everybody has ignored, and I take it under the party presentation principle. We will ignore them, too, but it's an important background principle. I think that there's some nuances in the law under a First Amendment speech claim as opposed to an association claim. Admittedly, these cases weren't presented as your Honor states, but I'm not sure that those cases would water down the association claim as much as they might be applicable to the speech claim. Well, one case says the First Amendment does not impose any obligation on the government to listen to, respond to, recognize, or bargain with a public sector union. That's Smith against highway employees. It didn't say which part of the First Amendment. It's just not there. But as I say, the sheriff has not made this argument, so you should count yourself very lucky. Thank you, Your Honor. If there was additional briefing required by the court, I'd be happy to look on this. If we require additional briefs, we will let you know. Thank you, Your Honor. So moving back to this timing issue that the district court erred on, I believe, the point we're trying to make here is that by considering it in a vacuum and not as part of an overall convincing mosaic, it gives too little weight to the importance of the timing here. You realize we have abolished the convincing mosaic nonsense. Lawyers and district judges keep talking about it. We had an opinion circulated under Circuit Rule 40 telling people to stop talking like that. I'm surprised that it continues. I duly note it, Your Honor. I will stop with that immediately. So moving away from that, the other piece is— Your point, though, Mr. Casper, still stands. Your point in using the language that you were losing, I take it to be, as you throw all the evidence in the pile and you look at all the evidence together in the pile, you all have made a prima facie case. That is our argument. That's the argument we're making, Your Honor. And the other major piece of circumstantial evidence we wanted to highlight in court today is the new higher evidence. And this is by far the largest piece of circumstantial evidence we have. In the same—nearly the same week that the commanders were fired or laid off, whatever nomenclature we use, the sheriff is hiring 12 new people, and this is according to their own business record. Now, but there's no evidence in the record that they hired anybody to fill the commander's positions. Indeed, those positions were disbanded. The duties were then dispersed, reassigned elsewhere in the department. So let me ask you this. If we discount the new higher evidence, okay, just as the district court did, do you still win? I believe we do because when we still have the timing evidence, we have the shifting explanations between all the different folks who were deposed, between Brad Curry and Matt Burke and Nika Jones-Tapia. We've got the seem issues that were discussed extensively below. We've got the—yeah, I mean, the fact that HR was mysteriously cut out of this entire process without, in our view, reasonable explanation. Do you have anything in the record that tells us that HR is normally involved in these decisions? Well, no. Who cut and when? We don't have that evidence, but we submit that HR is the— is a classic function of HR to be involved in hiring, firing, pay issues, all kinds of employee issues, and for whatever reason, in this particular instance— Do you need the HR evidence to win? No, I don't need that either. We've still got the timing. We've got the shifting explanations. We've got all the other pieces of circumstantial evidence in this record. We've got the fact that it was only the commanders who were seemingly laid off, and they were not called back. Some of the other folks who were laid off were called back just the following year, just a few months later. And overall, thematically, it is that absolute, we are going to lay off the commanders no matter what attitude that permeates this record that is itself a piece of circumstantial evidence. Isn't there some evidence in the record as well, though, that the sheriff's office considered a lot of other cost-saving mechanisms that could be used to affect the cost savings they needed to get around the soda tax? I mean, really, there's no evidence that they just focused on the commanders, is there? We submit that Brad Curry, who was admittedly the ultimate decision-maker, ignored all the other options, ignored them because he was so hyper-focused on getting rid of the commanders. So, yes, they did try to make the case about that in the discovery process that they considered these other options, but Brad Curry never actually truly considered them. He was going to lay off the commanders. How do we know that? From his testimony. What does he say to make sure of this? Overall, the impression we have from him is that, well, for example, we have Matt Burke and Nika Jones-Tapia and Jeff Johnson, who are sort of operational directors under him, coming to him with alternatives to save the commanders, and he still doesn't accept any of those alternatives. In fact, Matt Burke said that these were operationally feasible and fiscally feasible alternatives, and Brad Curry still doesn't consider them. It is the commanders that he's going for. Does Mr. Curry at any point in his testimony indicate why he is focused on the commanders? I'm sorry, I missed the first part. Does he ever indicate why he is focused on the commanders? No. We don't have a statement from him that says why it's the commanders in particular, and that is the very curiosity of it. Why this fixation from him on the commanders, especially when we have 12 other people being hired for $650,000 about the same week that our folks are being laid off? I mean, that mismatching conduct. That happens all the time during budget cuts. This place needs people. It needs to replace people in other roles, and it really is a wash on the budget cuts, so you don't worry about it. That could be so, Your Honor, but the question here is was this used as a pretext to off the commanders who just won their union decision? That's the issue, and we submit that ignoring that 12 other new hires the same week, that is a slugger piece of circumstantial evidence. To your point, maybe a jury would see it completely the other way and we have it all wrong, but we submit this was decided on summary judgment, and with these pieces of circumstantial evidence, Your Honor, this is enough to give these commanders that jury. Let the jury decide in our view. And the district court, one other thing I want to focus on here, with respect to the new hire evidence, it seemed to require that the plaintiffs have to prove a one-to-one savings plus costs, like the new hires would cost exactly the same as the laid off commanders would save in order to make this argument work, and that is in the district court decision, and that's not what's required by the law. It's the piles of circumstantial evidence, and we submit this inconsistent conduct together with the timing, together with the heck-bent focus on the commanders by Curry, those all together create that inference, and this should have gotten to a jury. I will yield the remainder of my time. I think I saved three minutes for rebuttal unless there's further questions right now. Certainly, counsel. Mr. Leinenweber. Good morning. May it please the court. I'd like to begin by briefly answering Judge Ripple's question regarding why Chief Curry selected the commanders, and there is evidence in the record that Chief Curry testified that the reason he selected the commanders was that as leadership went through the various positions in the Department of Corrections, that the duties of the commanders, he believed, could be divided up between lieutenants and superintendents, with them assuming some of those responsibilities and picking up those things. So it wasn't a situation where Chief Curry willy-nilly selected the commanders. He believed and he testified that it was operationally feasible for the Department of Corrections to continue to operate without the commander position. But you're not discounting or disagreeing that there's also evidence in the record that no fewer than three other people, Jones, Tapia, Burke, and Johnson, believe that alternatives to firing the commander were operationally feasible and fiscally sound and met the county's demands. We've got testimony from all three of those people, and that they presented those options to Curry, but he did not select them. That's correct, Judge. Those individuals who were his direct reports in the Department of Corrections were tasked with looking into this and coming up with various possible scenarios under which budget cuts could be made. They did put forth a number of positions. It's routinely testified to, nobody wanted to let anybody go. This was an unprecedented budget crisis. Those individuals, Mr. Burke and Jones Tapia, they did put forth an effort to try and save those positions. However, Chief Curry, who is where the dollar stopped, decided that would not work, and he simply did not believe those things would work. For example, he testified that, how would I choose one commander versus another here? How can I move some down to lieutenant when the lieutenants then would have to bump down to sergeants, and we would have this sort of trickle down where the county wouldn't end up saving the requisite money? Or it would take so long that the budget deadline would come, and the county board would simply make the decision of which positions to cut. Now, isn't the question, you know, not whether the county is right here or the commanders are right here, but just whether this should have gone to a jury?  I'm going to point out here that this was correctly decided and should not have gone to a jury. No reasonable jury could look at this record and conclude that it was more likely than not that plaintiffs had proved their case that their union activities, which occurred years before and months before when the recommended decision and order was issued, was what caused their selection for the layoff. And even if plaintiffs could get over that hurdle, they still need to get over the pretext hurdle. And there is no circumstance under which a reasonable jury could conclude that the legitimate non-retaliatory reason for the layoffs, admittedly budget cuts required by Cook County, could have been a lie made up to select these commanders to get rid of them for their union activities. There's been so much discussion in Mr. Casper's brief regarding the timing and did the court examine the timing alone. First of all, the court considered all of the evidence. And the timing evidence here, which is important, timing is important here. It is the context in the court, the courts, the case law directs you have to look at the context in which these decisions were made. The context here, the timing here, shows that the sheriff's office had roughly two to three weeks within which to come up with these cuts. The sheriff appeared, sorry, the soda tax, which is the genesis of why we're here today, because the soda tax was repealed on October 11th, 2017. Just three weeks later, or excuse me, two weeks later, the sheriff's office held its budget hearing with the Cook County board. Those board members said, sheriff, why do you have so many layers of supervision in the Department of Corrections? And for context here, it's probably important to note that the Department of Corrections makes up the bulk of the sheriff's office's budget. So it is the vast majority of the budget. I'm concerned that your timing argument, not this particular part you've been talking about, but another feature of it, a large feature of it, really contorts our case law in a direction it's not going. You have the favorable decision, the favorable recommendation by the administrative law judge, and then you have the firing of the commanders a couple of months later. Now, of course, there's an intervening budget cut crisis, but you've just told us, well, the union activity was years before that and the favorable decision was months before that. But we don't say that the mere passage of time conclusively bars an inference of retaliation. The timing picture here does not bar an inference of retaliation. We've said there's no bright-line rule about how close the events have to be. So I'm concerned about that. Well, that's correct, Judge, and I think an excellent case to look to to understand why that is is that Baines v. Walgreens case, which has a nice sort of description of a period of six, I think it's six years, it's several years certainly, between the protected activity and then the later adverse action. But what that case had and what the other cases have, where there is an extended passage of time, is they have glue that connects, they have connective tissue that connects those two events. Now, in the Baines case, it was the fact that the supervisor who was involved in the earlier protected conduct later intervened, years later, in a way that was extremely out of ordinary to say, do not hire that person. Well, let me ask you about some connective tissue. There was a superintendent who was fired who testified at the Illinois Labor Relations Board hearing. That's correct. In addition to all the commanders who obviously had their petition before the board. Correct. And who were fired. Was any other sheriff's office employee a witness at the Labor Relations Board hearing? Yes, there were other witnesses. I do not recall the names of them, but I certainly know, I believe there was an attorney from the legal department who testified. So there were at least one other witness. Were there any other superintendents who testified? I don't believe so. So the only superintendent who did testify was fired in the budget cuts. That is correct. However, he was a witness for the sheriff. And it's worth noting that the sheriff ultimately did prevail in this matter before the ILRB in February 2018. And that was later though. Yeah. We're looking at the moment in time of fall 2017, November 2017 to be exact. Yeah. It is true that that individual was like, he was fired.  But there were other staff cutoffs along with, and I should be clear, it was not just the commanders who were let go. There were dozens of other employees. These cuts touched virtually every aspect of the sheriff's office, from IT to administration to other departments, the police department, court services, and numerous other positions were let go. Nurses were let go. Investigators were let go. Police were let go. Caseworkers, electronic monitoring, numerous other positions were let go from other divisions. But again, the important thing here was, oh, sorry. Well, you know, it's still a very nagging thing that by letting all of the commanders go, the sheriff got rid of a very troublesome, adverse NLRB trial level decision that jeopardized his continued control over these commanders. I guess I just don't see it from that perspective, certainly in the sense that, first of all, they were not troublesome in any sense other than, yes, they did try to form a union, and the sheriff's office has a practice of when management tries to unionize, they oppose that. The sheriff's office is not against unionization. Almost 90%, I believe, of the sheriff's office is unionized. Apparently the sheriff considered these people management. Correct, yes. And so did the Illinois Labor Relations Board when it decided in February 2018 that they could not form a union. But the other point I wanted to make- Would a jury find it hard to believe an attorney's suggestion that they weren't considered troublesome when the commanders are able to put forward these kind of negative comments that some of the folks were making at the sheriff's department about the commanders and about their union activity? I believe there's two comments that are several years old, Your Honor. Did they take place during the union effort? Sorry, did they take place during- They took place during the union effort, didn't they? They did, which began in 2013, and the layoffs were in 2017. So they were relevant to the union effort. Certainly relevant, Your Honor. However, it's also worth noting, and I do not think a jury could possibly conclude, that, for example, Ms. Jones-Tapia's comments regarding unionization or regarding union, which was an offhand comment regarding some AFSCME members coming to a meeting. It wasn't about unionization generally or trying to form a union or anything like that. But more importantly, as Your Honor started our discussion today with, Ms. Jones-Tapia tried to save the commanders. She put forward suggestions. She said, I think there's another way we can do it, and unfortunately it didn't work out. The sheriff's office put forward numerous other proposals to avoid layoffs completely throughout the summer of 2017 to make budget cuts that the county rejected. At any point during that process, if the sheriff's office had really wanted to retaliate against the commanders, they could have simply put them forward and eliminated them early on. They could have put them on the chopping block, and they never did that. It wasn't until two days after Chairman Daley wrote to the sheriff's office and said, you have to cut $62.5 million, and I need your proposal in seven days. It was two days later that the issue of eliminating the commander position was first raised by Ms. Helen Burke and sent it to Matt Burke and said, what are the financial aspects of this, and what are the operational aspects of this? And when those operational and fiscal aspects were considered, it revealed that they saved money. They saved millions of dollars by eliminating the commander position. And Chief Curry, who was the chief operating officer of the sheriff's office, the person who you want making these kinds of decisions, said, operationally, I can live without this level of supervision, which the Cook County Board had just said, why do you have so many supervisors here? And I can divide up their responsibilities among lieutenants and superintendents, and we can move on, and we can survive. So, your honors, I believe that no reasonable jury could find that plaintiffs would be able to meet their burden, that their layoffs were caused by their union activities, or that the sheriff's explanation that they selected them because it was operationally feasible, because they required budget cuts, was a lie. Council has conceded as much. The budget cuts were not a lie. They were a necessity, and it was a rapid, short period of time in which they needed to find people to put forward to the county. And finally, I'd also add that the individual defendants are entitled to qualified immunity for exercising their discretion regarding these budget cuts. And for these reasons, and as set forth in our briefs, your honors, we ask that you affirm the district court's judgments, and unless you have any further questions, I'll yield the remainder of my time. Thank you. Thank you, Mr. Leinenweber. Anything further, Mr. Casper? Actually, your honors, I have nothing to add to my original argument in my brief, but unless there's additional questions, I would yield my time. Thank you, counsel. The case is taken under advisement.